**LISA SCOLARI**
Attorney at Law
20 Vesey Street,  Suite 400
New York, New York 10007
scolarilaw@gmail.com
212-227-8899

October 12,  2022

Hon. Sidney H. Stein
United States District Court
500 Pearl Street
New York, New York 10007

Re: United States v. William Sinclair
17 Cr. 243 (SHS)

Your Honor :

      This letter is respectfully submitted in advance of William Sinclair's sentencing scheduled for October 26, 2022.

### *Procedural Background*

      William Sinclair plead guilty to two counts of conspiracy to commit wire fraud and one count of money laundering pursuant to a cooperation agreement with the government. The pre-sentence report contains an advisory guideline range of 87-108 months and recommends a 366 day sentence. (PSR p.26) In light of Mr. Sinclair's extraordinary cooperation and other 18 U.S.C. §3553(a) factors, the defense respectfully submits that time served sentence and a period of supervised release would be an appropriate sentence in this case.

### *Involvement in the instant offense*

      The crime in which William Sinclair participated, defrauding unsophisticated, mostly older people, is reprehensible. The Court is well aware of Mr. Sinclair's conduct from seeing his testimony at the trial of several co-defendants. Although there is no excuse for his actions, there are factors that help explain how Mr. Sinclair, who is apparently an otherwise decent person, could have engaged in such behavior. During the conspiracy, Bill was in the throes of a serious oxycodone addiction, taking as many as 30 pills a day. He ran Olive Branch with his partner Michael Finocchiaro and was well aware of what employees were doing, but he did not make phone calls that enticed victims to pay money. His heavy drug use and lack of direct contact with victims may have desensitized him to the severity of his conduct.

      Mr. Sinclair recognizes that the circumstances do not excuse his behavior. He is deeply remorseful and has attempted to atone for his wrongdoing by cooperating with the government. His letter to the Court is attached. (Exhibit A)

*History and Characteristics*

     Bill Sinclair is a forty-eight year old who was raised in modest economic circumstances by a single mother after his parents broke up when he was an infant. His father Allan Sinclair was a N.Y.C. transit track worker and his mother Jane Moss was a hair dresser. After the divorce, Allan provided no financial assistance and his mother struggled to support him. Although Bill and Jane lived in a well-to-do town, the family's home was located in a low income housing development. He did not go hungry but, as Bill grew out of his clothes Jane could not afford to buy new ones. Fortunately, Bill's maternal grandmother Lucille Moss earned a substantial income an executive assistant to the head of an aeronautics company. She often stepped in to help her only child and grandchild.  If it were not for his maternal grandmother, Bill would not have had the basics such as appropriate clothing, including a winter coat and boots, or school supplies.

     In addition to the financial instability, life with Jane was insecure because of her relationship choices. When Bill was a toddler, his mother became involved with a man who wanted Lucille's money. He and Jane attempted to kill Lucille and they both went to prison when Bill was around five years old. Bill was very young but believes that his step-brother Todd was born just before Jane was incarcerated. Bill went to live with this father and Todd went into foster care. Although Allan provided for Bill financially during that time he was not any more involved in his life than when Bill was living with his mother. Bill has had to rely on his grandmother for any semblance of a close family relationship.

     Due to his mother's financial struggles during his childhood, Bill has always aspired to economic security. He worked at part time jobs in high school and college to make ends meet. Bill's father developed sarcoidosis, a scarring of his lungs, and struggled to breathe. Allan believed his heath was destroyed by spending his career working in subway tunnels. When Bill was nineteen Allan died of a heart attack at fifty-seven. Aware that his parent's jobs failed to provide them with either a comfortable financial or healthy life, Bill aspired to a better, "white collar" career.  With Lucille's help, Bill was the first person in his family to graduate college. He earned a degree in business management and has worked steadily since.

     Bill has tragically lost his entire family through illness or incarceration. His step-brother Todd was convicted of murder and has been serving a twenty five year sentence since 2011. Before they had a falling out, Bill supported Todd and assisted him financially for many years. Bill's mother Jane developed Alzheimer's disease and had to go into residential care in 2014. Lucille and Bill visited Jane weekly for several years, but eventually she no longer knew who they were. Bill was crushed when Lucille was diagnosed with lung in December, 2016, and he moved into an apartment in her building to help care for her. He was devastated when she succumbed to the disease in May of 2018.

*Oxycodone addiction*

Bill began taking oxycodone around 2011, his use worsened, and he was seriously addicted by 2012. The drug's insidiousness was clarified by the testimony of a pain management specialist introduced by the government at the S.D.N.Y. trial of a "pill mill" doctor. *United States v. Kevin Lowe*, 14 Cr. 55 (LGS) Christopher Gharibo, MD explained that oxycodone has a "very feel-good effect", "a high", a "euphoria" (Exhibit B Tr. 744) The feeling stays for a couple of hours and "they crash afterwards", the high is followed by "a sense of panic, anxiety and a lot of disturbing side effects". (Exhibit B Tr. 747 and 744) The person "becomes dependent... because oxycodone becomes part of the person's biochemistry." "They need oxycodone to feel normal". (Exhibit B Tr. 746)

The addiction is notoriously difficult to beat and Bill's eventual 30 pill a day habit was particularly severe. Despite this he chose to get help and get clean nearly six months before his arrest. With the assistance of a doctor, in September, 2016, he began taking suboxone, a medication that reduces the severity of opioid withdrawal and blunts the craving for the drug. Bill was successful in refraining from oxycodone for several months and would have abstained completely but for his grandmother's cancer diagnosis in December, 2016. Heartbroken and terrified of losing his best friend, Bill began to take the occasional pill but his use never got close to the amount he had been taking. After his release from custody on March 21, 2017 Bill never touched another illegal substance. He continued to ease his cravings with suboxone for a few months and then weaned himself off of it. Bill has been drug tested during his time on supervised release and has remained clean.

Apart from his involvement in the conduct that led to this case, Bill has tried to live an honorable, law abiding life. According to the letters written by his long-term friends Bill is "kind, genuine, loyal", "caring, trustworthy, compassionate". (Exhibit C) More importantly he is "overwhelmed with remorse", "committed to improving, constantly assessing himself, looking for guidance on what he can do better". (Exhibit C)

*Post arrest conduct*

Bill was released from custody immediately after his arrest in March of 2017 and his conduct for five and a half years has been flawless. In addition to remaining free of a powerful drug addiction he has worked legally despite the challenges of finding a job with a pending case during the pandemic. He initially began working a car dealership but left that position for a better opportunity at Momentum Solar, a solar power company, in October 2017. Bill was there until September, 2020, but left due to the lack of business. He moved to what appeared to be another promising another solar company, Green State Energy, in November, 2020, but realized after a few months that there was even less business at that fledgling company. He quickly found another sales position at All Season Solar, where he has worked since February, 2021. Bill is proud of his work at All Season as he is selling a valuable product that not only helps the environment but saves his customers thousands of dollars in energy costs.

As describe in the government's letter to the Court, Bill has cooperated extensively during the past five and half years. Throughout that process Bill has demonstrated his contrition and attempted to make amends for his wrongdoing.

The consequences of a prison sentence will be devastating because Bill will lose everything that he has worked so hard to achieve. He will no longer have a job or an apartment. He will have to start over as a convicted felon, with no home and no family to take him in. It is very unlikely that he will be able to find anything approaching his current relatively lucrative employment with a conviction. His friends care deeply for him but none of them has the capacity to give him a home. It will be difficult for Bill to find an apartment as landlords not only require verifiable employment, but background and credit checks. It is apparent from the corrected financial information below that Bill has struggled financially despite working more that fifty hours a week and living frugally. His credit has been destroyed because his previous credit card debt is in collections.

*Objections to the PSR*

It is rare to receive draft and final pre-sentence reports so replete with error. After receiving the first draft, the defense sent an email to the probation officer with more than twelve corrections. The government did not object to the requested changes. The government gave the officer specific instructions regarding the guideline calculation but the officer still got it wrong in the draft report and it had to be corrected. Despite this, the addendum included in the final report indicates that neither the government nor the defense had filed objections (PSR p. 27)

Most but not all of the defense corrections were made. The remaining errors:
**Employment record**
paragraph 75, p. 18
Mr. Sinclair works between 55 and 60 hours a week.

**Financial condition: Ability to pay**
**Assets**
paragraph 80, page 19
Mr. Sinclair no longer has the jewelry and watch valued at $9,000.00 as he sold that property in 2018 and 2021 to pay his bills.

**Monthly expenses**
paragraph 80, page 20
The report failed to include:  $850 rather than $800/mo groceries
$100/mo for automobile gas as well as $100 for home gas
$250/mo for non-prescription allergy medication and nasal spray
$100/mo for car expenses, tolls, and maintenance

With the additions above, Bill's total monthly expenses are: $5341.00

**Total monthly cash flow**
This number is incorrect because it was arrived at by subtracting Mr. Sinclair's monthly expenses from his *gross* monthly income rather than his after tax, take home pay.
He takes home about $5600/mo which leaves him with about $259.00, after expenses.

**Sentencing Recommendation**
page 27
The recommendation of 366 days is inconsistent with the recommendation made by Senior Probation Officer Jill Jeffries for Michael Finocchiaro, who had the same guideline and a less fulsome 5K letter than Mr. Sinclair. Although we were not privy to his 5K letter, Mr. Finocchiaro was not called as a prosecution witness at trial and did not assist the government to prosecute the same number of people that Mr. Sinclair helped with. Although the officer cut and pasted from the government's 5K letter he appears to have overlooked the fact that Bill's cooperation was "extraordinary' a characterization sparingly used in 5K letters.

*Conclusion*
The defense respectfully requests that the Court sentence Bill Sinclair to time served and a period of probation. Although his crime was distressingly serious, he has done all that is humanly possible to rehabilitate himself, getting clean and staying drug free, working steadily and legally, and cooperating with the government. The Court can be sure that Bill will not re-offend, because he is deeply ashamed of his conduct, and despite many challenges, he has conducted himself honorably for the last five and a half years. There is no reason to send Bill to prison other than to punish him, but instead it is appropriate to temper punishment with mercy in this case. Bill will not disappoint the Court if he is given a second chance.

Respectfully,
*Lisa Scolari*
Lisa Scolari